UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | No. 5:17-CR-26-KKC-REW |
| v. | ) | |
| | ) | RECOMMENDED DISPOSITION |
| DARMON VONTA SHAW, | ) | |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

On November 6, 2017, the Court conducted a hearing concerning Defendant Darmon Shaw's pretrial detention or release status. The case comes to the undersigned in an unusual procedural posture. Law enforcement arrested Shaw on the Indictment warrant in the Eastern District of Michigan. United States Magistrate Judge R. Steven Whalen, of the arresting District, conducted a detention hearing and determined to release Shaw pending trial. DE #105-5 (Order Setting Conditions of Release).

The United States sought a stay of the release order (as well as revocation of Magistrate Judge Whalen's release order) in this District (the charging District). DE #102 (Motion). Chief Judge Caldwell granted a stay, remanding Shaw "to the custody of the United States Marshal until a hearing can be held to address the Motion for revocation of the Release Order." DE #103 (Order). The USMS thus transported Shaw in custody to this District. The undersigned arraigned Shaw on October 23, 2017. DE #115. Defendant later, by counsel, moved "to lift the stay of the Release Order." DE #123 (Motion). The Chief Judge thus scheduled a detention hearing, DE ##124 & 125 (Orders), which the undersigned ultimately conducted upon Judge Caldwell's

1

request and referral. The Court first discusses the procedural posture of the case, as well as the limitations on the undersigned's authority in this distinct scenario, before turning to a plenary Bail Reform Act (BRA) analysis to inform the recommendation to the Chief Judge.

*Procedural Analysis*

In this procedural posture—where a magistrate judge in the arresting District ordered Defendant released pretrial, and the presiding district judge in the charging District stayed that release order—the undersigned, as a magistrate judge in the charging District, lacks authority to directly alter Defendant's custodial status or make a controlling determination of that status. *See, e.g.*, 18 U.S.C. § 3145(a)(1); *United States v. Cisneros*, 328 F.3d 610, 615-16 (10th Cir. 2003); *United States v. Hassanshahi*, 989 F. Supp. 2d 110, 113 (D.D.C. 2013) (endorsing the Tenth Circuit's "holding that only a district judge in the charging district, and not a magistrate judge in that district, may review the release order of a magistrate judge in the arresting district"); *United States v. Cannon*, 711 F. Supp. 2d 602, 608 n.5 (E.D. Va. 2010) ("not[ing] that it is unclear whether a magistrate judge in the charging district can review even the decision of another magistrate judge in the arresting district"); *United States v. Johnson*, 858 F. Supp. 119, 122 (N.D. Ind. 1994) ("Section 3145(a) authorizes a district judge to review a decision made by a magistrate judge, but it does not confer the same authority upon a magistrate judge in the charging district when the challenged order was issued by a magistrate judge in the arresting district."); *United States v. Patterson*, No. 13-137, 2013 WL 5375438, at *3 (E.D. La. Sept. 24, 2013) (thoroughly discussing the cases and issues).

The Tenth Circuit's discussion on this topic is persuasive and worthy of extended quotation:

> Although the government properly filed its revocation motion in the New Mexico district court [the charging District], the review of the Arizona release order [from the arresting District] was conducted in the first instance by Magistrate Judge Svet. Only after [Magistrate] Judge Svet entered his detention order, and Cisneros appealed it, did District Judge Armijo consider the government's motion. This is improper procedure for processing a § 3145(a) motion. The motion should be considered and ruled upon in the first instance by a district judge in the court of original jurisdiction. . . .
>
> The text of § 3145(a) supports the conclusion that a motion to revoke a magistrate judge's release order should be ruled on directly by a district judge. We agree with the reasoning of a district court from another circuit that explained:
>
>> It is clear from the wording of Section 3145(a) that 'a court having original jurisdiction over the offense' must be interpreted as the district judge assigned to the case . . . [T]hat section suggests a hierarchy for reviewing a magistrate's decision. In other words, Section 3145(a) authorizes a district judge to review a decision made by a magistrate judge, but it does not confer the same authority upon a magistrate judge in the charging district when the challenged order was issued by a magistrate judge in the arresting district.
>
> *United States v. Johnson,* 858 F. Supp. 119, 122 (N.D. Ind. 1994). The hierarchy suggested by § 3145(a) is consistent with the ultimate decision-making power and continuing jurisdiction over the actions of magistrate judges that district court judges possess. . . . As we read § 3145(a), therefore, [Magistrate] Judge Svet had no authority to rule on the government's motion to revoke the Arizona magistrate judge's release order.

*Cisneros*, 328 F.3d at 615-16.

However, although the undersigned, per § 3145 and this harmonious case law, has "no authority to rule on" the Government's motion to revoke Magistrate Judge Whalen's release order, "there appears to be absolutely no reason why the district judge conducting the review cannot initially refer the review to a magistrate judge in h[er] own district on a report and recommendation basis." *United States v. Ross*, No. 1:05-CR-160, 2007 WL 1295995, at *2 (W.D. Mich. Apr. 6, 2007). Magistrate Judge Brenneman continued:

> The statute does not prohibit [this practice], and addressing the issue of detention is hardly foreign territory to a magistrate judge since it is one of a magistrate judge's core responsibilities. Moreover, a report and recommendation provides the district judge with the same opportunity to conduct a *de novo* review that would occur if the district judge handled the review personally in the first instance. 28 U.S.C. § 636(b)(1).

*Id.*; *see also United States v. Maragiaga*, No. 1:06-CR-278-JEC-GGB, 2010 WL 2950338, at *1-2 (N.D. Ga. June 28, 2010) (in bond violation context, recognizing that a magistrate judge "may not be empowered to enter a final order revoking the defendant's release" because the defendant "was released pursuant to an order of a United States Magistrate Judge in the Southern District of Texas," and following *Ross* to recommend revocation to the district judge). The Court agrees with *Ross* and *Maragiaga* insofar as it sees nothing in the BRA that precludes Judge Caldwell, in her discretion, from referring the dual motions (the Government's motion to revoke and Shaw's motion to lift the stay), in this particular context, to the undersigned for a recommended disposition, as the Chief Judge has validly done here. *See also* 28 U.S.C. § 636(b)(1) & (3).

The Court emphasizes that the "ultimate decision-making power" concerning the two motions remains firmly, indeed solely, with Judge Caldwell. *Cisneros*, 328 F.3d at 616. Indeed, the *de novo* review in which the Chief Judge will engage—whether on direct review of the Michigan proceedings, or on review of this recommendation (which also accounts for the Michigan proceedings)—is the decisive protection of both parties' interests concerning Shaw's pretrial detention or release. *See, e.g.*, *id.* ("Because [District] Judge Armijo reviewed [Magistrate] Judge Svet's detention order de novo and considered all of the evidence that had been offered to that point—including both the evidence submitted to Magistrate Judge Anderson in Arizona and Magistrate Judge Svet in New Mexico—the fact that [Magistrate] Judge Svet ruled on the matter is irrelevant."); *Ross*, 2007 WL 1295995, at *2 (emphasizing that while a

4

recommendation can be "particularly useful" in this context, the district judge will ultimately conduct "a *de novo* review of the detention issue," permitting an opportunity for "further input by the parties"); *see also Patterson*, 2013 WL 5375438, at *3 n.3 ("Because the district judge is required to review the magistrate judge's decision *de novo*, the district judge can, but need not, hold another detention hearing."). Judge Caldwell's decision to refer the matter to the undersigned only augments the established record for her fresh consideration to include the audio of the hearing, the admitted exhibit, and this recommendation, which she may choose to further develop if and as she sees fit.

*BRA Analysis*

The Court now turns to the substance of the matter at hand: Defendant Shaw's pretrial release or detention status. The Court has considered the full record to this point, including the Second Superseding Indictment, the E.D. Mich. docket, the Michigan detention hearing audio (in 3 parts), the content of the detention hearing held before the undersigned, the Pretrial Services Report ("PSR"), and the E.D. Ky. USPO's accompanying memorandum. The Court, for the reasons that follow, recommends that Judge Caldwell detain Defendant pending trial based on irremediable risk of danger and nonappearance.

The Second Superseding Indictment charges Shaw with conspiring to knowingly and intentionally distribute heroin and carfentanyl from in or about July 2016 through on or about January 19, 2017, in Garrard, Jessamine, and Fayette Counties, in violation of 21 U.S.C. §§ 841(a)(1) and 846. *See* DE #65. The grand jury alleged that the quantity of carfentanyl attributable to Shaw is 10 grams or more, an aggravated amount, in violation of § 841(b)(1)(B)(vi). *See id.*

For the charge, the BRA, 18 U.S.C. § 3141, *et seq.*, imposes a presumption of detention as to both flight risk and danger. The Court assesses the presumption under the BRA and *United States v. Stone,* 608 F.3d 939, 945-46 (6th Cir. 2010). *See also United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986) (imposing burden of production on defendant to produce "some evidence that he will not flee or endanger the community if released" in face of presumption); *United States v. Hernandez*, No. 1:02-CR-006, 2002 WL 1377911, at *2 (E.D. Tenn. Feb. 27, 2002) (crafting production burden as "the burden of producing probative, credible evidence to rebut the presumption and support his [defendant's] contention that he will appear . . . and he does not pose a danger"). This is only a production burden, and it is "not heavy." *See Stone*, 608 F.3d at 945 (noting duty to "introduce at least some evidence"). An unrebutted presumption requires detention. A rebutted presumption remains a pro-detention statutory factor. *See id.*

Under this standard, the Court finds, in its assessment, that Shaw rebutted each presumption. The chief and overriding factor, to the Court, is that Magistrate Judge Whalen has already determined that Shaw is a suitable candidate for pretrial release (though without the benefit of any live witness(es) at the detention hearing and, admittedly, with little explicitly stated oral analysis). The Court, though, would be hard-pressed, as a general matter, to conclude that a judicial colleague's determination of release suitability (under the federal standards) would not be *some* evidence that the defendant would reappear and not pose a danger. Additionally, the Michigan USPO, in its measured opinion, evaluated Shaw and recommended release (although, of course, the Kentucky USPO reached a different conclusion), also weighing in favor of rebuttal.

Specifically as to flight, the Court notes the following additional factors supporting rebuttal: (1) Shaw has utterly no history of failing to appear; (2) Shaw's brother professes that Defendant can live with him if released, at a residence the Michigan USPO and Judge Whalen previously found suitable; (3) Shaw has no flight-assistive assets; and (4) Shaw has family ties to the Eastern District of Michigan, including a pregnant girlfriend. As to danger, the following additional factors aid presumption rebuttal: (1) Shaw, age 22, has zero adult criminal history; (2) Shaw, per counsel's proffer, had enrolled in classes to obtain his GED and was about to start a job, through a temp service, with Forge Industries; (3) Shaw could obtain employment via his brother's landscaping business; and (4) counsel's general proffer that Shaw, now with a child on the way, has taken steps to better his life.

This multifaceted showing, combined with the Michigan USPO's recommendation and Judge Whalen's findings, suffices to rebut each presumption, in the Court's view, although danger rebuttal is a closer call. The rebuttal bar is low, *Stone*, 608 F.3d at 945, and the Court concludes that the combination of factors above—most critically, Judge Whalen's release decision, the Michigan USPO's recommendation, Shaw's complete lack of an adult criminal record, and Defendant's various proffered positive life steps—crosses that low bar, in these circumstances.

With the presumption rebutted, the § 3142(g) factors drive the overall analysis, though the presumption persists as an evidentiary factor. Under the complete BRA review, the Court finds that the Act compels danger- and flight-based detention.

Shaw faces an extremely serious charge of conspiring to distribute heroin and carfentanyl. The grand jury charged that 10 grams or more of carfentanyl are attributable to

Shaw. Based on the charge, Defendant confronts a very lengthy potential sentence if convicted—a mandatory minimum of 5 years, and up to 40 years, in prison. Factor (g)(1) as to Shaw is unquestionably pro-detention.

The law presumes Defendant innocent,[1] and detention does not relate in any way to punishment. The United States here called DEA TFO (of the Winchester Police Department) Michael Wattenberger, who has 24 years of experience in law enforcement (including 8 as a TFO), to the stand. TFO Wattenberger described law enforcement's investigation into a series of Jessamine County overdoses that occurred in January 2017, specifically narrating Shaw's connection to the charged conspiracy. On January 8, 2017 (the day before the rash of Jessamine overdoses), police discovered Co-Defendant Lehmann in a car with a passenger who had overdosed from consuming a heroin / carfentanyl mix. Through a CI, law enforcement tagged an individual known as "Little Bro" or "Lil Bro" as Lehmann's source of supply and, eventually, identified Little Bro / Lil Bro as Shaw.

During investigation of the Jessamine overdoses, law enforcement identified Co-Defendant Thornton as the ultimate source of the offending drug mixture. During surveillance and investigation of Thornton in Detroit, officers determined that Shaw was an acquaintance of Thornton's. Specifically, when law enforcement conducted a traffic stop of Thornton's vehicle on or about January 19, 2017, Shaw was Thornton's passenger. The pair had been smoking pot to celebrate Shaw's birthday (and there was marijuana in the car at the time of the stop). At the

---

[1] "This factor goes to the weight of the evidence of dangerousness, not the weight of the evidence of the defendant's guilt." *Stone*, 608 F.3d at 948; *but cf. Kaley v. United States*, 134 S. Ct. 1090, 1098 n.6 (2014). Still, to the Court, evidence of guilt is relevant to community risk, and strong case proof has an impact on flight risk.

time, however, law enforcement did not suspect Shaw of involvement in the conspiracy involving the Jessamine overdoses. Both men were, at least for a time, taken into custody.

While Thornton and Shaw were in the back of the police cruiser following this traffic stop, they made a series of highly concerning recorded cell phone calls. Police had let Shaw keep his phone. Shaw, according to TFO Wattenberger, who had reviewed the audio, telephonically directed "Jasmine," who was Thornton's girlfriend, to, *inter alia*, either directly or via another person, "get the shit out of the house" and "go downstairs, get the book bag, there's a baggie, get that baggie, and flush that shit." Shaw thus directly, while sitting in the back of a police cruiser, instructed a third-party to destroy evidence of drug trafficking. Further, while Thornton and Shaw sat in the cruiser, Shaw orally expressed concern over providing police his real name and date of birth, and Thornton referred to Shaw as "Johnny." The name "Johnny" later piqued investigative interest because certain seized or related phones were registered to "Johnny Jones" or "Johnny Shaw" with Lexington addresses, although the street name utilized does not exist in Lexington (and instead was listed on Shaw's driver's license in Detroit). Shaw, after the traffic stop, was ultimately released from custody.[2]

Shaw's name later resurfaced as the investigation continued. Police discovered that Lehmann's phone had been in contact with Shaw and came to believe that Shaw was Lehmann's source of supply for the controlled substances that led to the January incident. A CI identified the phone associated with "Johnny Shaw" with the Michigan street listed as in Lexington as, in fact, Shaw's phone. The CI also identified a photo of Shaw (which Wattenberger suspected was either

---

[2] Police led Shaw to believe they would be searching Shaw's home, but they actually were searching, per a warrant, Thornton's Dickerson address while the men sat in the cruiser. In that home, the DEA found multiple controlled substances, to include a batch of heroin / carfentanyl that appeared similar to the Lehmann batch from January.

the photo taken during the traffic stop, or Shaw's Michigan ID photo) as Little Bro / Lil Bro. Further, during the Lehmann investigation, law enforcement came to believe that Thornton would send Shaw to Kentucky to deliver controlled substances; this conclusion came via CI information, phone records, and seemingly corresponding characteristics (such as distinct color and smell) between the substance found in Thornton's residence and that distributed in Jessamine County. Shaw's phone records indeed showed contact with Thornton, Lehmann, and Co-Defendant Doolin during the time period of the charged conspiracy. Law enforcement attribute an astonishing 2,500+ grams of a heroin mix to Shaw. To summarize, per TFO Wattenberger, the proof against Shaw is strong. The proof shows Shaw readily capable of large-scale drug trafficking and deception toward authorities. Accordingly, factor (g)(2) indicates clear danger and, thus, detention.

Shaw, age 22, presents few pro-release criteria. As the Court has covered, Defendant has no adult criminal history. Shaw reports no health concerns. His brother professes a willingness to house him. Defense counsel emphasized Shaw "taking active steps to enroll in" GED classes, Defendant's recent efforts to attain employment, and the child he is now expecting. Shaw has many family ties to Michigan.

The negatives, though, conclusively outweigh the positives. Shaw has utterly no Kentucky connections (save for alleged drug-related ones), heightening the risk of nonappearance in this District. Shaw, though 22, has only the barest history of legitimate employment, serving as a dishwasher for 2 months—from June to August 2017. There is no (positive, at least) explanation of Shaw's daily activity from age 18 to June 2017. The PSR reflects no formal educational achievements. Shaw reports being homeless. He faces here an

*extremely* serious and, as the proof showed, well-supported charge of conspiracy to distribute heroin / carfentanyl in this District, with a 5-year mandatory minimum. He admitted to the USPO being "an active marijuana user," smoking his last joint the day before the USPO interview.[3]

There is some competing evidence as to flight. On the pro-release side, Shaw's record reveals no failures to appear (indeed, he has no adult criminal record). He has family ties to Michigan and a child on the way. On the other hand, Shaw has no (legitimate, at least) ties to Kentucky, where he confronts this serious charge. He faces a mandatory minimum of 5 years, and potentially up to 40 years, in prison, heightening the flight risk. Shaw is itinerant and homeless, and the Court would not permit him to live in his brother's home, given the information the Court knows of the brother—including that he has a criminal record, and that Judge Whalen (while, contradictorily, endorsing the residence) found him to be an unsuitable third-party custodian. [Further, Shaw's brother, though present at the Michigan detention hearing, did not testify, and he did not appear for the hearing in this District. Accordingly, the Court has never seen or directly heard from the brother, leaving the Court unable to endorse, for any credible reason, his suitability to house Defendant pending trial.] The expressed case proof showed Shaw, though with no obvious income source, to be readily mobile and able to make drug courier trips to Kentucky, spending nights in extended stay facilities on Richmond Road.

---

[3] Contrary to defense counsel's argument at the hearing, marijuana possession generally remains criminal activity in Michigan. *See, e.g.*, *People v. Bylsma*, 825 N.W.2d 543, 551 (Mich. 2012) (stating that the Michigan Medical Marijuana Act "does *not* create a general right for individuals to use and possess marijuana in Michigan. Indeed, marijuana remains a schedule 1 controlled substance under the Public Health Code[.]" (internal quotation marks and footnote removed; emphasis in original)); *People v. Bendele*, No. 334677, 2017 WL 4654980, at *4 (Mich. Ct. App. Oct. 17, 2017) ("The MMMA does *not* create a general right for individuals to use and possess marijuana in Michigan. Possession, manufacture, and delivery of marijuana remain punishable offenses under Michigan law." (emphasis in original)). Additionally, and regardless, marijuana possession remains illegal under federal law. 21 U.S.C. § 844(a).

Additionally, Shaw perhaps has taken recent steps to better his lot, including enrolling in GED classes and trying to find work, but to this point, those remain merely aspirational. Shaw has never proven himself in education or employment pursuits. Indeed, Shaw himself admitted to being an active marijuana user until the day prior to his USPO interview. Add to all this what TFO Wattenberger expressed clearly on the stand: that Shaw, facing the possibility of legal trouble, immediately—literally still in the back of the police cruiser—directed a third party to destroy evidence of drug trafficking. Shaw was distraught that he had given police his true name instead of engaging in further deceptive tactics. Shaw directed destruction of evidence and wished he had lied to police. Defendant's efforts at trickery extend to the phony phone registrations, backtracking on phone ownership, and use of multiple aliases. The presumption that Shaw would not reappear remains, importantly, a factor for the Court to consider. Based on facts supported by a preponderance, considering this combination of factors, the Court could not trust conditions to reasonably ensure Shaw's future court appearances. The strong weight of evidence is negative as to appearance reliability.

The danger proof similarly points directly to detention. Strong case proof illustrates Shaw engaging in *extremely* dangerous heroin / carfentanyl activity. It would be nearly impossible to overstate carfentanyl's dangerousness in general, and to the Eastern Kentucky community specifically. Law enforcement assigns over 2,500 grams of such a carfentanyl / heroin mixture to Shaw directly. The proof TFO Wattenberger expressed on the stand was direct, clear, and strongly corroborative of Shaw's participation in the alleged conspiracy that led to much peril in Jessamine County. Shaw has no residence, no employment, and no education. He actively smokes pot. Indeed, he and Thornton had been smoking weed, and had marijuana in the car, at

the time of the traffic stop. The Court reiterates the stark concerns over Shaw's deceptive efforts detailed above. All told, the Court, in its assessment, could not trust conditions to reasonably assure against manifest danger risks on this record. An unemployed, homeless Defendant, with no educational achievements, who actively uses marijuana and faces a minimum of 5, and up to 40, years on the grave and well-supported heroin / carfentanyl conspiracy charge, with Shaw's proven deceptive ability and stated wish that he had lied further to police, is simply not, in the Court's view, a realistic candidate for federal release because of danger risk.

Under the full analysis, in the Court's assessment, the United States demonstrated by clear and convincing evidence facts indicating that conditions would not reasonably assure community safety. The Court finds, under the standard, for all the reasons stated, flight- and danger-based detention required. Shaw is too dangerous to be released on conditions, and the Court could not trust, for the reasons discussed above, conditions to reasonably assure against nonappearance. The District Court should order Shaw held in custody pending trial.

*Conclusion*

For these reasons, the Court **RECOMMENDS** that the District Court **GRANT** the United States's motion for revocation of Judge Whalen's release order (contained in DE #102), **DENY** Defendant's motion to lift the stay on the release order (DE #123), and **ORDER** Defendant held in custody pending trial based on irremediable risk of danger and nonappearance.[4]

---

[4] If the District Court adopts this Recommendation, the Chief Judge should include the following standard language in the Order:

> Defendant is committed to the custody of the Attorney General or a designated representative for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or held in custody

\* \* \* \* \*

The Court issues this Recommended Disposition pursuant to 28 U.S.C. § 636(b)(1)(B). The parties should consult 28 U.S.C. § 636(b)(1) and Federal Rule of Criminal Procedure 59(b) for specific appeal rights and mechanics. As discussed at the hearing, the Court **shortens** the parties' objection period. Any party objecting to this Recommendation shall file such objection **within 5 days**. Failure to object in accordance with the Rule waives a party's right to review. Upon filing of any objection(s), the motions shall stand submitted to Judge Caldwell for further Orders.

This the 7th day of November, 2017.

Signed By:
Robert E. Wier  *REW*
United States Magistrate Judge

---

pending appeal. Defendant must be afforded a reasonable opportunity to consult privately with defense counsel. On order of the United States Court or on request of an attorney for the Government, the person in charge of the corrections facility must deliver Defendant to the United States Marshal for a court appearance.